# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-70015

United States Court of Appeals
Fifth Circuit

**FILED**
August 1, 2014

Lyle W. Cayce
Clerk

CLIFTON LAMAR WILLIAMS,

Petitioner - Appellant

v.

WILLIAM STEPHENS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Eastern District of Texas

Before JONES, DENNIS, and HAYNES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

A jury found Clifton Lamar Williams guilty and sentenced him to death for the brutal robbery and murder of a 93-year-old woman. After exhausting his state remedies, Williams filed a federal habeas petition under 28 U.S.C. § 2254, claiming ineffective assistance of counsel and that he is intellectually disabled[1] and therefore ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002). In a thorough opinion, the district court rejected the petition. Williams now seeks a certificate of

---

[1] We have substituted "intellectual disability" for "mental retardation," the term used by the parties and the Supreme Court in *Atkins*. *Hall v. Florida*, 572 U.S. ___, 134 S. Ct. 1986, 1990 (2014).

No. 13-70015

appealability (COA) under 28 U.S.C. § 2253(c)(2). For the following reasons, we DENY the COA application.

## Background

### 1.    Facts

On July 9, 2005, then 21-year old Williams broke into the home of Cecilia Schneider, beat, strangled, and stabbed her to death. Williams laid Schneider's dead body on her bed and set it afire, destroying incriminating evidence of the crime. He then fled in the victim's car, disposed of the murder weapon and the clothes he was wearing, and denied any connection to the murder. Eventually, Williams told the Tyler, Texas police that Jamarist Paxton, an acquaintance, forced him to participate in the offense and that his own involvement was minimal. At Williams's trial, however, Paxton testified that he was not involved in the offense, and the police were unable to find any evidence to substantiate Williams's claim that someone else was involved in Schneider's murder. The jury found Williams guilty of capital murder and sentenced him to death.

### 2.    Procedure

Williams filed a direct appeal with the Texas Court of Criminal Appeals ("CCA"), raising seven points of error. The CCA affirmed the trial court on all points. Williams did not seek Supreme Court review. While his direct appeal was pending before the CCA, Williams sought habeas corpus under TEX. CODE CRIM. PROC. ART. 11.071. The state trial court conducted an evidentiary hearing, and issued a report and findings recommending denial of habeas relief. The CCA approved the trial court's findings and denied habeas relief. Williams then filed a federal habeas petition, raising ten claims for relief, along with a motion to stay and abate the federal action because his petition asserted a previously unexhausted claim. The district court denied the motion, and Williams amended his petition to omit the unexhausted claim. After the

No. 13-70015

district court denied relief, Williams sought a Certificate of Appealability (COA), which the district court also denied.  The motion for COA has been renewed in this court.

## Standard of Review

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a state court prisoner must obtain a COA before appealing a federal district court's denial of habeas relief.  28 U.S.C. § 2253(c)(1)(A).  This is warranted upon a "substantial showing of the denial of a constitutional right."  *Id.* § 2253(c)(2).  Where, as here, the district court rejects the Petitioner's constitutional claims on the merits, this court will issue a COA only if the petitioner demonstrates that reasonable jurists could debate whether the district court's resolution of his constitutional claims was correct, or could conclude that the issues presented "deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003) (internal quotation marks and citation omitted).  In cases involving the death penalty, "[A]ny doubt as to whether a COA should issue in a death–penalty case must be resolved in favor of the petitioner."  *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

In determining whether the district court's denial of a prisoner's petition is debatable, this court "must be mindful of the deferential standard of review the district court applied to [the habeas petition] as required by the AEDPA." *Miniel v. Cockrell*, 339 F.3d 331, 336 (5th Cir. 2003).  AEDPA requires the petitioner to prove that the adjudication by the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  The focus of the "unreasonable application"

inquiry is on whether the state court's application of clearly established federal law was objectively unreasonable. *Williams v. Taylor*, 529 U.S. 362, 411, 120 S. Ct. 1495, 1522 (2000). Accordingly, a state court's application of a federal law may be reasonable for the purposes of § 2254(d) even though another court has applied the same law differently. *Id.* In sum, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (internal quotation marks and citation omitted).

## Discussion

Williams advances nine claims for relief. The first eight claims assert that Williams's trial counsel were ineffective. The ninth contests the jury's finding that Williams is not intellectually disabled. Williams pressed the same nine theories in his petition to the district court. Because the ineffective assistance claims comprise the vast bulk of Williams's appeal, the principles controlling these claims are set forth first. We then address each of Williams's claims in turn.

It is noteworthy that the State afforded Williams highly experienced defense counsel and access to investigators and multiple experts, as reflected in the state habeas findings. The punishment phase of trial lasted for days, and the trial court's attentiveness to detail is reflected in the paucity of challenges to trial procedure.

## 1.    Ineffective assistance of counsel

To establish that he was denied constitutionally effective assistance of counsel, Williams must demonstrate that (1) counsel rendered deficient performance, and (2) counsel's actions resulted in prejudice.    *Strickland v. Washington*, 466 U.S. 668, 687–88, 690, 104 S. Ct. 2052, 2064-65 (1984).   Both of these prongs must be proven, and the failure to prove one of them will defeat the claim, making it unnecessary to examine the other prong.   *Id.* at 687, 104 S. Ct. at 2064.   The deficient performance prong requires proof that, in light of all the circumstances, counsel's performance fell below an objective standard of reasonableness.   *Id.* at 687–88.   In determining whether counsel's performance was deficient, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).   The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," and avoid "the distorting effect of hindsight."   *Id.* at 689–90.   To demonstrate prejudice, the second prong, Williams must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Id.* at 694.   The Supreme Court has further held that the likelihood of a different outcome must be "substantial, not just conceivable."   *Harrington*, 131 S. Ct. at 792.

Viewing the *Strickland* test from the narrow perspective afforded federal courts by AEDPA results in even greater deference to the state courts' judgment.   This is because , "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'... and when the two apply in tandem, review is 'doubly so.' " *Harrington*, 131 S. Ct. at 788 (citations omitted).

**2.    Williams's admission that he was in possession of a razor blade**

Williams asserts that his trial counsel was constitutionally ineffective because they allowed Williams to admit in open court that, while awaiting trial, he had impermissibly taken a razor blade from the shower area back to his cell.  Williams argues that this admission had a prejudicial effect on the testimony of Dr. Tynus McNeel, a State's expert, and the jury's decision regarding future dangerousness.

Williams disputes the district court's reading of the trial court record.  Assuming, *arguendo*, that Williams's counsel was deficient for allowing the "uncounseled" admission, Williams cannot establish prejudice.  Dr. McNeel explained that he formed his final opinion that Williams was a future threat based on considerably  more than just the razor blade incident.  He also considered all the evidence of Williams's disruptive behavior in jail.  Dr. McNeel read a transcript of Williams's testimony regarding the razor blade, which showed that Williams became agitated by a prison guard's testimony and uttered an audible profanity in open court, prompting the trial judge to excuse the jury and admonish him about his courtroom behavior.  There was plenty of testimony and evidence unrelated to the razor blade incident that supported the state's expert witnesses and the verdict.  Various witnesses described Williams as a volatile and aggressive inmate.  According to their testimony:

> [Williams] had been involved in several other disruptive events while in jail including being disrespectful and using profanity toward a female guard, a plan to fight with another inmate, an altercation with an inmate over a cup of coffee, a threat to slap a jailer, the discovery of a trustee [*sic*] jacket in [Williams]'s cell, as well as a physical altercation with another inmate that required the other inmate to be taken to a jail clinic.

Memorandum Opinion at 25, *Williams v. Thaler*, No. 1:09-CV-00271 (E.D. Tex. Mar. 26, 2013), ECF No. 31.  Two expert witnesses, Dr. McNeel and

Dr. Edward Gripon, testified that Williams was a future threat to society. Williams's criminal history, which included the brutality of Ms. Schneider's murder and Williams's lack of remorse, a prior conviction for criminal trespass, and an arrest and his confession to unauthorized use of a motor vehicle, was also submitted to the jury. And unlike Dr. McNeel, who merely read the transcript of Williams's courtroom outburst, the jury witnessed the profanity and agitation firsthand and was able to draw its own conclusions regarding Williams's future dangerousness.

In sum, because Williams has failed to show prejudice, reasonable jurists could not debate the district court's conclusion that the state courts did not unreasonably apply *Strickland* in holding that trial counsel were not ineffective for allowing Williams to admit, or not preventing his admission, that he removed the razor blade to his jail cell.

**3.    State's access to Williams**

Williams argues that trial counsel were ineffective in allowing Dr. Gripon to interview Williams. During cross–examination in the penalty phase, trial counsel questioned Dr. McNeel about his failure to interview Williams. Outside of the jury's presence, the State objected that Dr. McNeel could not have interviewed Williams without counsel's permission, which had not been granted. The State asserted the jury had been misled. Trial counsel replied that he had not denied access to Williams, but had insisted that he not be interviewed until after the defense had presented evidence negating Williams's future dangerousness. Further, he did not object to Williams's being interviewed at the appropriate time. As a result, Dr. Gripon interviewed Williams that evening. Before the interview, Dr. Gripon had testified to the jury that Williams was a future danger. Dr. Gripon testified during the State's rebuttal that the interview strengthened his opinion that Williams would be a future danger. He also opined, responding to Williams's mitigation

7

contentions, that Williams is not intellectually disabled or paranoid schizophrenic.

Williams contends that trial counsel erred by "opening the door" to the interview, and then compounded the error by allowing the expert to opine on Williams's future dangerousness as well as his lack of intellectual disability. *Estelle v. Smith* holds that a "criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." 451 U.S. 454, 468, 101 S. Ct. 1866, 1876 (1981).       Here, however, Williams placed his mental state at issue before and during trial.   Before trial, counsel were aware that examination by a State's psychiatrist would be required when Williams presented his own expert defense testimony on mental retardation, paranoid schizophrenia and future dangerousness.  Indeed, Dr. Gripon testified about these issues only after Williams had presented two psychological experts who testified that he was not a future threat to society.   Thus, Dr. Gripon's testimony does not run afoul of *Smith*.

Assuming, *arguendo*, that trial counsel erred in allowing Dr. Gripon to examine Williams, any error was harmless.  In its punishment phase case in chief, the State's two experts testified extensively concerning Williams's future dangerousness and a separate expert testified on mental retardation. Dr. Gripon had already testified that there was a probability that Williams constituted a continuing threat to society.  His rebuttal testimony, moreover, was limited in comparison to his earlier testimony, which was based on a comprehensive review of Williams's background and the circumstances of the murder.   Williams makes no effort to explain how Dr. Gripon's rebuttal testimony adversely affected his intellectual disability claim beyond the evidence already presented by the State.   Prejudice has not been shown.  For

these reasons, reasonable jurists could not debate the district court's holding that the state court did not unreasonably apply *Strickland* in concluding that trial counsel were not ineffective for "opening the door" to Dr. Gripon's interview and rebuttal testimony.

### 4.    Insanity defense

Williams argues that trial counsel's handling of an insanity defense was incompetent for two reasons.   First, Williams contends that trial counsel blundered by raising the insanity defense four months after the initial pretrial hearing.   Second, he claims that there was no colorable insanity defense in this case, and trial counsel prejudiced Williams by alleging this defense.

The discussion that occurred after trial counsel filed a notice of insanity defense is fatal to Williams's first contention.  When the matter was taken up, trial counsel informed the trial court that he did not believe that the filing was late.  The State objected that the filing was untimely.  After the trial court commented that it would be inclined to allow the filing absent a showing by the State of "some strong basis for not doing so," the State withdrew its objection, and the notice was deemed timely filed.  Thus, there is no support for Williams's argument that trial counsel were deficient for not raising the insanity defense at the initial pretrial hearing.

As to the second argument, Williams notes that under Texas law, "[i]nsanity is an affirmative defense to prosecution when, *at the time of the conduct charged*, the actor, as a result of a severe mental disease or defect, did not know that his conduct was wrong."  TEX. PEN. CODE § 8.01(a) (emphasis added).  Williams then points to various actions he took *after* he murdered Schneider, including that he burned the victim's body,  fled the scene, disposed of the murder weapon, and initially lied to the police.  According to Williams, all of the *post*–murder evidence shows that he knew he knew that his conduct was wrong.  Williams's conduct after the murder, however, does not preclude

a finding of insanity *at the time of the murder*.  Further, when trial counsel gave notice, they knew that Williams had been previously diagnosed with paranoid schizophrenia but had not yet received the defense psychologist's report.  Taken in context, trial counsel's decision to raise the insanity defense, even though they did not ultimately pursue it, cannot form the basis of habeas relief.  *Ransom v. Johnson*, 717 F.2d 199, 206 (5th Cir. 1983) (holding that trial counsel's informed and reasoned practical judgments "will not be second-guessed").

Even if Williams could establish deficient performance, he cannot show prejudice.  Williams contends that, as a result of counsel's pleading the insanity defense, he was ordered to submit to examinations by court–appointed experts, who later rendered opinions contrary to Williams's claims that he is intellectually disabled and does not constitute a continuing threat to society.  Trial counsel, however, had already agreed to allow the State's mental retardation expert to examine Williams in return for the State's assurance that it would withdraw its notice of intent to seek the death penalty if its expert concluded that Williams is intellectually disabled.  Indeed, the State's mental retardation expert had examined Williams four times *before* trial counsel filed the notice regarding the insanity defense.  Thus, reasonable jurists could not debate the district court's holding that the state courts did not unreasonably apply *Strickland* in concluding that trial counsel were not ineffective in the manner in which they pursued the insanity defense.

5.    **Literacy Council records**

When he was 20 years old, Williams took an Adult Basic Education test at the Literacy Council of Tyler.  Williams scored on a second grade level for reading and a fifth grade level for math.  According to Williams, his poor test scores at the Literacy Council would have shown that his school grades were misleading and would have fortified the argument that he had received several

decent marks only due to the school's reluctance to fail or hold back students, rather than because Williams had a higher aptitude than an intellectually disabled individual. Williams contends that his trial counsel were ineffective in failing to publish to the jury evidence of his Literary Council test scores.

The Council records, however, were cumulative and had limited probative value. At the evidentiary hearing in the state habeas action, trial counsel stated that they did not find the records significant in light of Williams's school records, because his performance on standardized tests indicated his diminished intellectual functioning better than his grades. As to the probative value of the Council records, Nancy Crawford, head of the Council and its records custodian, explained that the Adult Basic Education test was designed as a placement tool so that the Council would know where to start GED instruction with a given student. Crawford further indicated that the testing conditions at the Council were far from optimal; the entire amount of time Williams spent at the Council was 10.75 hours over approximately one year; and he never attended a single class at the Council. This record showed the records' low probative value. Accordingly, reasonable jurists could not debate the district court's conclusion that the state courts did not unreasonably apply *Strickland* in concluding that trial counsel were not ineffective for failing to emphasize the Literary Council test scores.

**6.    Duties at Kentucky Fried Chicken**

Williams contends that trial counsel were ineffective because they did not sufficiently controvert the State's characterization of Williams's work at Kentucky Fried Chicken (KFC). At trial, the State asserted that Williams's job as a cook at KFC required the ability to measure spices in the proper proportion and cook chicken appropriately. Williams argues that had trial counsel investigated Williams's job duties, they would have been able to explain that all of KFC's ingredients uses are pre–mixed, and all that Williams

had to do was open boxes, sift various ingredients together and dredge the chicken.

To provide effective assistance, "trial counsel must not ignore pertinent avenues of investigation, or even a single particularly promising investigation lead." *Charles v. Stephens*, 736 F.3d 380, 389 (5th Cir. 2013) (per curiam). Here, however, Williams's trial counsel were fully aware of their client's duties at KFC. They obtained Williams's employment records and interviewed his former employers. Trial counsel ultimately made a tactical decision not to focus on Williams's limited duties as a KFC cook because they believed that the jury would learn that Williams was in fact able to cook simple meals for himself. Instead, trial counsel emphasized Williams's unsteady work history. As they explained, defense experts said that Williams's inability to keep a "low functioning" job was consistent with mental retardation.

The fact that trial counsel used Williams's tenure at KFC to show his inability to hold a job, and not his alleged inability to cook, is well within the "wide latitude" that the Supreme Court has afforded criminal defense counsel in making tactical decisions. *Harrington*, 131 S. Ct. at 789. Williams, moreover, cannot show that he was prejudiced by trial counsel's approach, because another defense witness, Dr. Thomas Allen, gave the jury a basis for inferring that Williams's duties as a cook did not entail a high degree of complexity. During the punishment phase, Dr. Allen testified that chain restaurants such as KFC do not rely on their cooks to measure and add spices, but use essentially pre–packaged seasoning. Thus, reasonable jurists could not debate the district court's conclusion that the state courts did not unreasonably apply *Strickland* in holding that trial counsel's basis for challenging the State's characterization of Williams's work at Kentucky Fried Chicken (KFC) did not render his counsel ineffective.

**7.     Expert testimony on future dangerousness**

Williams contends that trial counsel were ineffective for not objecting to the testimony by the State's psychiatric and psychological experts that he constituted a future threat to society.  Although he concedes that psychiatric testimony about future dangerousness is currently admissible under *Barefoot v. Estelle*, 463 U.S. 880 (1983), Williams argues that trial counsel should have challenged that holding as incompatible with the Supreme Court's later decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), thereby paving the way for the Supreme Court to revise the current rule.

Williams's argument, however, does not show that the state court's decision was *contrary* to, or involved an *un*reasonable application of, clearly established federal law, as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1).  Williams instead argues that trial counsel failed to press his version of what the law on psychiatric evidence *should* be.  His contention that the Supreme Court may overrule *Barefoot* in light of *Daubert* is completely speculative.  This court, moreover, has held that *Daubert* does not apply to the standards governing the admissibility of expert evidence at a capital sentencing hearing, *United States v. Fields*, 483 F.3d 313, 341-46 (5th Cir. 2007), and has rejected the notion that trial counsel is deficient for not challenging the continued validity of *Barefoot*.  *Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) ("We also disagree that Johnson could have persuasively argued to the district court that *Daubert* or *Robinson* altered the admissibility of this type of evidence after *Barefoot*.")    In light of these holdings, reasonable jurists could not debate the district court's ruling that that the state courts did not unreasonably apply *Strickland* in concluding that trial counsel were not deficient for failing to object to the testimony from the State's psychiatric and psychological experts.

**8.    Mistaken belief as to Dr. Patton**

Williams claims that trial counsel were ineffective because they mistakenly believed that defense expert, Dr. James Patton, was not qualified to render an opinion that Williams is intellectually disabled.  Had Dr. Patton opined on the issue, Williams notes, the defense would have presented *three* experts versus the *two* presented by the State.   Williams contends that  by presenting more expert witnesses, his counsel would have met the preponderance of evidence standard  set out in *Ex parte Briseno*, 135 S.W.3d 1 (Tex. Crim. App. 2004), and thereby proved that he is intellectually disabled.

Williams's trial counsel called Dr. Patton to testify solely on the issue of adaptive deficits, one component of a mental retardation diagnosis, and not to render an opinion on whether Williams is intellectually disabled.   Before Patton's testimony, during the State's *voir dire* of the expert witness, the prosecutor questioned Patton's credentials to make a diagnosis of mental retardation.  Williams argues that trial counsel erred by not rebutting this line of questioning by citing *In re Hearn*, 418 F.3d 444 (5th Cir. 2005), where the court held that Dr. Patton is qualified to diagnose intellectual disability.

*In re Hearn* is irrelevant, however, because the purpose of Dr. Patton's testimony in this case was to offer his opinion on Williams's adaptive deficits, not to make an intellectual disability diagnosis.   Further, the record establishes that this decision to focus Dr. Patton's testimony was reasonable trial strategy.  Dr. Patton testified *after* the other two defense experts had opined that Williams is intellectually disabled.  Dr. Patton's testimony would have been cumulative, and may also have carried less weight with the jurors given his lesser credentials.  Finally, Williams's claim that the presence of a third witness would have convinced the jury that he is intellectually disabled is entirely speculative and does not accurately describe the preponderance standard.   Conflicting expert testimony invites juries to make a credibility

determination, not to tally which side produced more experts. *See Chester v. Thaler*, 666 F.3d 340, 349 (5th Cir. 2011), *cert. denied*, 133 S. Ct. 525 (2012). Accordingly, reasonable jurists could not debate the district court's conclusion that the state courts did not unreasonably apply *Strickland* in holding trial counsel were not ineffective for focusing Dr. Patton's testimony on adaptive deficits.

**9.   *Atkins* challenge**

In his ninth and final challenge, Williams contends that because he is intellectually disabled, he is ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002).

Texas follows the American Association on Mental Retardation ("AAMR") definition of intellectual disability for *Atkins* claims presented in death–penalty cases.   Under this definition, intellectual disability is characterized by: (1) "significantly subaverage" general intellectual functioning; (2) accompanied by "related" limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18. *Briseno*, 135 S.W.3d at 7. In *Briseno*, the CCA created seven evidentiary factors to assist the factfinder in determining, within the AAMR framework, whether a particular defendant is in fact intellectually disabled. *Id*. at 8.

Williams's argument has three parts.  First, Williams takes issue with the CCA's use of several of the *Briseno* factors.  This court, however, has previously upheld the *Briseno* factors as an appropriate mechanism for enforcing *Atkins*'s prohibition against executing intellectually disabled capital defendants. *Chester*, 666 F. 3d at 347 (concluding that the *Briseno* factors do not contradict *Atkins*).  Thus, the CCA's use of the *Briseno* framework to evaluate Williams's claim was not an unreasonable application of federal law.

Second, Williams argues that the jury's conclusion that he is not intellectually disabled ignores lay testimony that he is mentally unstable as

well as expert opinion that his disciplinary problems at school and failure to hold a steady job could be explained by schizophrenia. Is it unclear how helpful these arguments are to Williams, since he acknowledges that mental retardation and paranoid schizophrenia are distinct diagnoses. Under AEDPA, Williams can prevail on this argument only by showing that the jury's finding that he is not intellectually disabled "was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings." 28 U.S.C. § 2254(d)(2). *See also Hooks v. Workman*, 689 F.3d 1148, 1166 (10th Cir. 2012) (holding that jury verdict must be upheld where rational trier of fact could have found that petitioner failed to establish by a preponderance of the evidence that he is intellectually disabled). Significantly, this court must presume the jury's finding to be correct "absent clear and convincing evidence to the contrary." 28 U.S.C. § 2254(e)(1). Here, the jury determined that Williams is not intellectually disabled after considering the "testimony of psychological experts from both sides in the field of mental retardation and others such as teachers, counselors and mental health providers who had contact with appellant before and after his incarceration." *Williams*, 270 S.W.3d at 132. Although there is some evidence in the 1,900 page record that Williams is intellectually disabled, it does not amount to clear and convincing proof that the jury's determination was incorrect. Thus, Williams's second argument fails.

Third, Williams argues that the evidence presented at trial proves that he met each of the three criteria for intellectual disability set forth in the AAMR definition. We need not go beyond two of these criteria regarding whether he has an IQ below 70. Williams points out that two of his experts—Dr. Robert McClure and Dr. Allen—both tested him and obtained IQ results below the AAMR's benchmark of 70. The CCA, however, found that the jury could have reasonably questioned the reliability of both diagnoses. There was

testimony that Williams misled and misrepresented his background to Dr. McClure, who examined Williams to determine his eligibility for Social Security benefits, and that Dr. McClure's assessment that Williams was "mildly" intellectually disabled was accordingly based on incomplete and inaccurate information. The CCA also found that Dr. Allen was not a credible witness because he based his opinion on information provided by Williams and his family members, and did not interview any of Williams's school teachers. Importantly, Dr. Timothy Proctor, an expert retained by the State, gave Williams a total of five IQ tests with scores of 70, 71, 73–74, 78, and 83. Even with the recognized, five–point standard error of measurement, Williams scored over 70 on two of these tests.

Williams also contends that he proved that he possessed adaptive deficits, the second AAMR factor. Dr. Proctor testified, however, that Williams's deficits in adaptive behavior were not in the intellectual disability range. Williams does not contradict this finding.

Reasonable jurists could not debate the district court's resolution of Williams's claim of intellectual disability.

## Conclusion

For the reasons herein stated, Williams's COA request is **DENIED**.

No. 13-70015

JAMES L. DENNIS, Circuit Judge, concurring in the judgment:

Based on the evidence of intellectual disability that was presented to the jury in this case, I concur in the denial of a certificate of appealability on the petitioner's claim of ineligibility for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002). However, with respect to the so-called "*Briseno* factors" that Texas applies to *Atkins* claims, *see Ex parte Briseno*, 135 S.W.3d 1, 8-9 (Tex. Crim. App. 2004), which the majority says are "appropriate," *ante*, at 15, I adhere to my views expressed in *Chester v. Thaler*, 666 F.3d 340 (5th Cir. 2011) (Dennis, J., dissenting), namely, that such factors may, depending on how they are applied, run afoul of *Atkins*. But in this case, the *Briseno* factors are simply irrelevant because the jury, to which the petitioner's *Atkins* claim was submitted and rejected, was not instructed as to the *Briseno* factors, and, thus, such factors did not and could not have affected the rejection of the *Atkins* claim. *See Williams v. State*, 270 S.W.3d 112, 133-34 (Tex. Crim. App. 2008) (jury instruction). And, in affirming the jury's conclusion, the Texas Court of Criminal Appeals did not purport to apply the *Briseno* factors in any manner either. In short, this case provides no occasion for us to opine in the abstract on whether the *Briseno* factors are generally "appropriate," and I do not join the majority's advisory opinion to that effect.

As for the petitioner's ineffective-assistance-of-counsel claims, I concur.