# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-70030

United States Court of Appeals
Fifth Circuit

**FILED**
September 9, 2016

Lyle W. Cayce
Clerk

OBIE D. WEATHERS, III,

　　　　Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

　　　　Respondent - Appellee

Appeals from the United States District Court
for the Western District of Texas
USDC No. 5:06-CV-868

Before DAVIS, JONES, and HAYNES, Circuit Judges.

EDITH H. JONES, Circuit Judge:*

Obie Weathers III ("Weathers") was convicted and sentenced to death for a murder committed during the course of a robbery of a San Antonio tavern. His conviction was affirmed on direct appeal, and, after exhausting his remedies in state court, Weathers filed a federal habeas petition under 28 U.S.C. § 2254, claiming, among other points of error, that he is intellectually

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

disabled[1] and therefore ineligible for execution under *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2244 (2002). The district court rejected the petition in a lengthy and detailed opinion. Weathers now seeks a certificate of appealability ("COA") under 28 U.S.C. § 2253(c)(2) to advance his *Atkins* claim. For the following reasons, we DENY the application for a COA.

## BACKGROUND

*Factual Background & Trial Proceedings*

After a crime spree involving a string of burglaries, theft, one murder, and one sexual assault of an elderly man over the course of just a few months, one evening in February, 2000, Weathers entered Pierce's Ice House, a tavern in San Antonio, Texas, wielding a handgun and concealing his face with a pillowcase with eyeholes cut out. Weathers informed the patrons that he intended to rob the ice house, but he told the three black men present to remain calm because he only wanted to rob the white individuals. Weathers robbed the white patrons, then ordered a waitress at gun point to empty the cash register. While the waitress was carrying the till to Weathers, she stumbled and Weathers pointed his gun at her head. At this time, one of the bar patrons, Ted Church ("Church"), swung at and grabbed Weathers. In the ensuing struggle, Weathers shot Church twice in the head and once in the abdomen. Weathers fled with over two-hundred dollars, but he was apprehended eleven days later and confessed to this and other crimes. Church was rushed to the hospital and underwent multiple surgeries, but he died weeks later from irreparable damage to his pancreas caused by the gunshot wound.

Weathers was indicted for the murder of Church on June 1, 2000, and a jury convicted him of capital murder in under three hours. After three days of

---

[1] The Supreme Court used the term "mental retardation" in *Atkins*, but has since used the term "intellectual disability" to describe the identical phenomenon. *See, e.g., Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014). We follow the same convention.

testimony at the punishment phase of the trial—where the jury heard testimony from the prosecution about Weathers's lengthy record of involvement in criminal conduct over a five year period from November 1995 to February 2000, as well as defense testimony from five character witnesses— they sentenced him to death.

*Postconviction Proceedings*

1. Direct Appeal & First State Habeas Petition

The Texas Court of Criminal Appeals affirmed the conviction and sentence. *Weathers v. State*, 2003 WL 22410067 (Tex. Crim. App. Oct. 22, 2003). Weathers filed an application for a writ of habeas corpus in state court in April 2003, asserting twenty-one grounds for relief, omitting an *Atkins* claim. After an evidentiary hearing, the state trial court recommended denying the application and the Court of Criminal Appeals adopted the recommendation. *Ex parte Obie Weathers III*, 2006 WL 2615531 (Tex. Crim. App. Sept. 13, 2006).

2. Second State Habeas Petition

In September 2007, Weathers filed a federal habeas petition, but moved to stay and hold his cause in abeyance pending state court exhaustion of an *Atkins* claim. Weathers's second state application received an evidentiary hearing over five days in May and August 2013.

a. The Evidence Before the State Habeas Court[2]

In support of his intellectual disability claim, Weathers presented the testimony of psychologist Dr. Joann Murphey, who examined Weathers for

---

[2] Weathers presented the testimony of: Dr. Joann Murphey, a clinical psychologist who evaluated him for intellectual disability in 2011; Cynthia Caruso, his sixth grade reading teacher; Sherry Logan, his tenth grade home economics teacher; Tammie Donaldson, a vocational consultant who analyzed his work history; B.D. Viola Weathers, his mother; and Moral Hill, his employer at a seafood restaurant. Also entered into evidence by petitioner were Dr. Murphey's report, which discussed Weathers's full scale scores on two IQ tests that

No. 15-70030

intellectual disability in 2011, after he had been on death row for ten years. She performed an IQ test on Weathers in May 2011 using the Wechsler Adult Intelligence Scale—IV ("WAIS—IV"), on which he scored a 53. Dr. Murphey doubted the accuracy of this result because she believed that Weathers was exhibiting psychotic symptoms, and she recommended that the Bexar County jail medical staff evaluate and possibly medicate him. *See Weathers v. Stephens*, 2015 WL 5098872, at \*37 (W.D. Tex. Aug. 31, 2015). After Weathers was put on anti-psychotic medication, Dr. Murphey tested him again in August 2011, and he scored a 65. *Id.* Dr. Murphey acknowledged that Weathers was administered an IQ test in 2008 and scored a 79. She was critical of this score, however, because the score was obtained using an older IQ test—the WAIS—III (because the WAIS—IV had not been released yet). *Id.* at \*54. Further, Dr. Murphey argued that the score of 79 was appropriately adjusted downward to a 73 by the doctor who administered it pursuant to the so-called Flynn effect.[3] *Id.* Based on these scores, Dr. Murphey concluded that Weathers has significantly sub-average intelligence.

Dr. Murphey also concluded that Weathers suffered from certain adaptive functioning deficits. To make this determination, she asked

she administered to him, as well as a third IQ test administered to Weathers by a Dr. Jesse Reed in 2008. The State offered the testimony of Dr. Joseph C. Sparks, a retired psychiatrist who worked for Bexar County and University Health System and evaluated Weathers's competency to stand trial in 2000 or 2001. The State also introduced Weathers's school records, prison letters, and recordings of his phone conversations while in jail. Finally, the court took judicial notice of the trial record on the State's request.

[3] The "Flynn effect" is an academic theory that posits that IQ test scores must be adjusted downward when administering an older test because over time standardized IQ test scores increase with the age of the test without a corresponding increase in actual intelligence in the general population. *See Weathers v. Stephens*, 2015 WL 5098872, at \*39 n.64 (W.D. Tex. Aug. 31, 2015). The *Flynn* effect has not been accepted as scientifically valid in the Fifth Circuit. *Gray v. Epps*, 616 F.3d 436, 447 n.9 (5th Cir. 2010) *cert. denied*, 131 S. Ct. 1785 (2011).

4

No. 15-70030

Weathers's mother, sister, grandmother, a former teacher, a childhood friend, a neighbor and church youth leader, and a former employer to rate Weathers in the categories of: communication, community use, functional academics, home living, health and safety, leisure, self-care, self-direction, and social. *Id.* at *38. After reviewing those ratings, as well as affidavits and other documents such as some of Weathers's academic records, Dr. Murphey concluded that Weathers exhibited adaptive deficits in the areas of communication, functional academics, and social skills. *Id.* at *39.

Weathers also presented the testimony of his sixth grade reading teacher and his high school home economics teacher. The sixth grade teacher testified that Weathers lacked the capacity to read, possessed a poor vocabulary, did not complete reading and writing assignments, and was working at a second grade level while in her class. On cross-examination, however, this teacher had no explanation for why she gave Weathers grades of 87 and 85 for the two semesters he was in her class. *Id.* at *40. His high school home economics teacher similarly testified to Weathers's educational struggles, noting that he had difficulty reading materials written at the eleventh and twelfth grade levels, wrote at the fifth grade level, often did not turn in assignments, was exempted from state-wide testing because of his poor reading skills,[4] and earned a 64 in her class, but was performing below that level. *Id.*

Weathers's mother also testified on her son's behalf. She related that he was in Special Education classes until sixth grade and was held back a grade in third or fourth grade. He took a long time to learn how to put on his boots as a child and had difficulty learning to tie and put on tennis shoes. He was

---

[4] 30–35% of the students at Weathers's high school were in special education classes, and if a student possessed poor reading skills, he or she would be exempted from statewide testing.

hyperactive and often ran around the house and broke things.  He did poorly in Sunday School and was unable to understand lessons on Sunday morning even after going over the lessons Saturday evening.  Her son obtained a learner's permit but never a driver's license although he occasionally drove himself to work.  Although Weathers earned money from his job at a seafood restaurant, the money often disappeared and he had hundreds of dollars in overdraft fees. *Id.* at *41–42.

Finally, Moral Hill, Weathers's former employer at a seafood restaurant, testified that he hired Weathers when he was 15 or 16 years old, and Weathers worked for him for about three years.  Weathers was initially employed as a busboy, but was later moved to the kitchen because he was clumsy and could not take orders well.  *Id.* at *42. Weathers required training, but eventually learned to operate the fryer and to cut and scale fish.  *Id.*  Once Weathers caught on, he was promoted to be a supervisor of two individuals; this supervisory position did not last long, however, because Hill eventually suspended Weathers for missing work.  *Id.*  Nonetheless, Weathers was later re-hired, although he became involved with drugs and his work became slower and sloppy.[5]  *Id.*

As its mental health expert, the State put on Dr. John C. Sparks, a retired psychiatrist whose professional career spanned fifty years and who worked with jail inmates while employed by Bexar County and University Health System from 1980–2006.  *Id.*  At the Bexar County jail, Dr. Sparks evaluated inmates' competency to stand trial and initially screened them for intellectual disabilities. If he suspected an intellectual disability, he would

---

[5] Moral Hill also testified at the sentencing phase of Weathers's trial. The testimony then had a different tone.  At sentencing, Hill testified that: Weathers was an "excellent employee" with "a great work history; Weathers worked well with others; and Weathers was the youngest employee ever promoted to supervisor because of his skills.

forward such individuals to the staff psychologists who conducted standardized intellectual disability testing. *Id.* at *42–43. At the request of a trial judge, Dr. Sparks evaluated Weathers in 2000 or 2001 for his competency to stand trial. *Id.* at *43. In addition to a clinical interview, Weathers filled out a "basic history" screening form, which helped Dr. Sparks to gauge Weathers's reading and writing skills and obtain background information. *Id.* at *44. Dr. Sparks testified that he did not perceive that Weathers was performing below the average level for inmates at the Bexar County jail—at about the sixth grade level—and did not otherwise find evidence to indicate that Weathers was sub-average in his intellectual abilities. As a result Dr. Sparks did not refer Weathers for IQ testing. *Id.* at *43. Dr. Sparks did not take issue with the results of IQ tests administered by others, but he testified that isolation (like that experienced by death row prisoners) could make an individual appear to be intellectually disabled, psychotic, anxious, or even schizoid. *Id.*

The State also presented approximately twenty hours of recorded telephone conversations between Weathers and a variety of individuals during his time as an inmate at Bexar County Detention Center in late 2012 and early 2013. Three hours of recordings involved Weathers's conversations with the chairman of Vassar College's art department, during which Weathers discussed, inter alia, the work of various artists, art concepts, the differences in the conditions of confinement of two prison units, television shows that he has watched, and the progress of his appeal. *Id.* at *45–46 n.76. Four hours of conversation between Weathers and family members included topics such as Weathers's explaining the difference between the BCADC inmate trust fund and TDCJ inmate trust fund; discussing his mother's surgery; reminding his mother to wish his sister a happy birthday; pondering why "an all-powerful God needs us to worship Him"; discussing television shows that he had watched; instructing his parents to have his brother give him the order number

of the package that was sent to the wrong unit; and asking whether federal spending cuts would have an impact on his father's job. *Id.* at *47–48 n.77. Finally, more than eleven hours of phone conversations occurred between Weathers and two disparate individuals, a retired businessman from Arkansas, and a female acquaintance to whom he offered emotional support and with whom he entered into a quasi-romantic relationship. These conversations covered subjects including college football, Weathers's views on mentally coping with incarceration, the different possible outcomes of his appeal, and Weathers's questions to both individuals about certain aspects of their lives. *Id.* at 48–49 n.78.[6]

Commenting on the phone calls, Dr. Sparks opined that the ability to converse about complex subjects such as the meaning of certain works of art, different emphases in certain artwork, and the consequences of a post-conviction capital habeas hearing, would not be indicative of intellectual disability. *Id.* at *43–44. When asked about these phone calls, Dr. Murphey acknowledged that Weathers communicated in an above-average manner, but she argued that this was simply evidence of Weathers's ability to "mask" his intellectual disability. *Id.* at *61 n.116.

b. The State Trial Court's Recommendation

Applying *Ex Parte Briseno*, 135 S.W.3d 1, 5 (Tex. Crim. App. 2004), the state habeas court concluded that Weathers had not demonstrated by a preponderance of evidence[7] that he was intellectually disabled. First, the court

---

[6] The federal district court opinion summarizes many of these conversations.

[7] Judges Price and Alcala of the Texas Court of Criminal Appeals issued separate concurring statements advising that the trial court applied too lenient a standard: because this was Weathers's second state habeas corpus petition, and because the *Atkins* claim was not raised in his first petition, he was required to demonstrate by clear and convincing evidence that no rational fact-finder would fail to find him intellectually disabled.

concluded that Weathers did not establish that he has significantly sub-average intellectual functioning because his 2008 WAIS-III score of 79 and Dr. Sparks's testimony about his impressions of Weathers in 2000 or 2001 contradicted Dr. Murphey's testimony.  The court further credited Dr. Sparks's testimony that years on death row could make individuals appear to be less intelligent than they are; as a result, the court discounted Dr. Murphey's WAIS-IV score of 65 because Weathers had been on death row for ten years in relative isolation when this test was administered.  Finally, although Dr. Murphey testified that she found no evidence that Weathers was "malingering" when taking the IQ tests, the court found otherwise.  Some evidence suggested that Weathers may have been attempting to manipulate the test results, particularly because Weathers understood the nature of the legal proceedings; Dr. Murphey did not believe the first IQ test she administered to him was a true reflection of his abilities; and Weathers's manipulative capabilities were demonstrated in his phone calls.

Second, the court concluded that Weathers failed to establish by a preponderance of evidence that he suffered from adaptive deficits.  The court noted that in over twenty hours of phone conversations, Weathers's vocabulary and use of language did not appear to indicate sub-average intelligence.  The court highlighted Weathers's work history, especially his supervisor's testimony that Weathers held the same job for three years, was the youngest person ever promoted to supervisor, and was an "excellent employee."  The court determined that the testimony about his school years, provided by former teachers, was inconclusive.  Weathers had both good and bad grades, but the court viewed the bad grades as reflective of his disruptive behavior, failure to complete his schoolwork, and possibly untreated ADHD.  The court also expressed skepticism about a teacher who testified that Weathers struggled in his reading and writing because, to the contrary, she gave him grades of 87

No. 15-70030

and 85. In sum, the evidence produced in support of the notion that Weathers suffers from adaptive deficits was "scant", and Dr. Murphey did not interview a "broad enough range of people" who knew Weathers as a youth.

Finally and critically, there was no evidence of Weathers's IQ before the age of 18. While he took special education classes in elementary school, the defense's own witness stated that students were placed in such classes for behavioral and emotional problems as well as intellectual disability, so it was not clear why Weathers was placed in such classes. Further, evidence contradicted that any intellectual disability commenced before Weathers was 18. Several teachers noted in disciplinary reports that Weathers could do his schoolwork, but simply would not do it. His high school principal testified that he was screened for special education, but his teachers thought he could do the school work. In kindergarten, Weathers received "Excellents" and "Satisfactories," which the trial court interpreted to indicate a child on track. Weathers also obtained some good grades later on, including a 94 in seventh-grade reading. The court attributed his bad grades to his disruptive nature and failure to complete the schoolwork. This conclusion was supported by his sister's testimony that Weathers's problems in school arose from "talking too much and not staying seated."

### 3. Texas Court of Criminal Appeals

In a one-page opinion, the Texas Court of Criminal Appeals adopted the trial judge's extensive findings and conclusions (with the exception of one sentence) and denied relief. *Ex Parte Weathers*, 2014 WL 1758977, at *1 (Tex. Crim. App. April 30, 2014). Judge Price, joined by Judge Johnson, filed a separate concurring statement expressing his opinion that, while Weathers had not demonstrated by clear and convincing evidence that no rational fact-finder would fail to find him intellectually disabled, he would conclude that Weathers demonstrated by a preponderance of evidence that he is "mildly

10

mentally retarded." *Id.* at *2, 5 (Price, J., concurring). Judge Alcala, joined by Judge Cochran, separately concurred, noting that the conflicting evidence presented at the hearing must be viewed in conjunction with the trial court's credibility findings and supported the decision to deny relief. *Id.* at *6 (Alcala, J., concurring).

### 4. Federal Habeas Petition

After exhausting his *Atkins* claim in state court, Weathers returned to federal court and amended his federal habeas petition to include the *Atkins* claim.[8] Weathers contended that the Texas Court of Criminal Appeals unreasonably determined the facts in light of the evidence presented. After an exhaustive recitation of the evidence before the habeas court, the district court concluded that the state court did not unreasonably determine the facts in light of the evidence presented.

First, concerning whether Weathers possessed sub-average intelligence, the court concluded that the state habeas court could have reasonably concluded that the scores obtained on Dr. Murphey's tests were not fully accurate approximations of Weathers's abilities. *See Weathers v. Stephens*, 2015 WL 5098872, at *66–67 (W.D. Tex. Aug. 31, 2015). The district court noted that the state habeas court could have questioned whether Weathers was motivated to give his best effort on the IQ tests given that his phone conversations indicated that he was cognizant of the possibility of obtaining a life sentence instead of a death sentence were he to succeed on any of his

---

[8] In addition to the *Atkins* claim, Weathers's federal habeas petition included one ineffective assistance of counsel claim, which the district court rejected, and a variety of challenges to the constitutionality of Texas's capital sentencing scheme, which the district court held were procedurally defaulted, and in the alternative, lacked merit. Weathers also requested a federal evidentiary hearing, which the district court denied pursuant to *Cullen v. Pinholster*, 563 U.S. 170, 131 S. Ct. 1388 (2011). Weathers, however, only seeks a COA from this court to pursue his *Atkins* claim.

habeas claims. *Id.* Moreover, given that the Fifth Circuit has not recognized the "Flynn effect," the district court concluded that the state habeas court was not required to accept the statistical manipulation of the IQ score of 79. *Id.* at *67. The court agreed that the state court could have reasonably questioned Dr. Murphey's conclusion that she found no evidence of malingering in the face of some evidence that Weathers understood the significance of his ongoing legal proceedings, as well as evidence that he had Antisocial Personality Disorder, which Dr. Murphey acknowledged would affect her ability to diagnose him correctly. *Id.* at *61–62 & nn.116, 121.

Second, the district court held that the state habeas court could have reasonably determined that Weathers failed to demonstrate adaptive deficits. The state court could have reasonably discounted Dr. Murphey's testimony because she conducted her analysis of Weathers on an incomplete record. Notably, Dr. Murphey did not review any of the evidence presented during the punishment phase of Weathers's trial. *Id.* at *56. Because of this, Dr. Murphey was unaware of: the full extent of Weathers's criminal history; the school records indicating that Weathers obtained good grades in middle school; the testimony of Weathers's middle and high school teachers—including his high school principal—indicating that Weathers was capable of doing the work, but chose not to; the testimony of Moral Hill describing Weathers as a good employee that contradicted his affidavit submitted to Dr. Murphey indicating that Weathers was a problem employee; and the testimony of Weathers's sister that: Weathers successfully hid his drug use from her, was not disruptive at home, and was about average in terms of emotional development and maturity. *Id.* at *56–59.

In addition to the trial evidence not considered by Dr. Murphey, the district court concluded that recordings of Weathers's phone calls provided further reason to call into question Dr. Murphey's assessment that Weathers

demonstrated adaptive deficits in the areas of communication and social skills. *Id.* at *62. In the district court's estimation, these recordings revealed that Weathers is "capable of being extremely personable and possesses knowledge of, and is able to communicate effectively on, a wide range of subjects, ranging from popular culture to historical topics." *Id.* Additionally, the district court noted the conversations indicated that Weathers is "highly manipulative, knowledgeable regarding his legal situation, and capable of communicating at a level well above that of a person with deficits in the adaptive functioning area of communication." *Id.* at *63. In fact, the district court stated that these conversations "refute any contention that Petitioner possess[es] any deficits in terms of his ability to communicate complex, even abstract, concepts" and that "anyone who listens to all of these conversations would inevitably reach the same conclusion as did the state habeas trial court, the Texas Court of Criminal Appeals, and Dr. Sparks—there is nothing about Petitioner's oral communications or social skills which would lead a rational person to even suspect Petitioner is intellectually disabled." *Id.* at *66–67 n.135.

A final reason for questioning Dr. Murphey's conclusion that Weathers has an intellectual disability, the district court noted, was that she obtained the adaptive functioning ratings from Weathers's friends and family who certainly knew that an intellectual disability diagnosis would provide Weathers's last chance to avoid execution. *Id.* at *63. Moreover, these ratings were made in 2011, more than a decade after Weathers had reached the end of his developmental period. *Id.*

In sum, the district court held that the state court did not unreasonably determine the facts in light of the evidence presented at the trial and accordingly denied habeas relief, as well as a certificate of appealability ("COA"). Weathers seeks a COA from this court to appeal the district court's denial of habeas relief on his *Atkins* claim.

No. 15-70030

## STANDARD OF REVIEW

In order to appeal a federal district court's denial of habeas relief, the Antiterrorism and Effective Death Penalty Act ("AEDPA") requires a state court prisoner first to obtain a COA. 28 U.S.C. § 2253(c)(1)(A). A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). A petitioner satisfies this standard if he makes a showing that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 1039 (2003) (internal citation omitted). This determination is a "threshold inquiry," and AEDPA in fact forbids a "full consideration of the factual or legal bases adduced in support of the claims" at this stage. *Id.* In death penalty cases, "any doubts as to whether a COA should issue must be resolved in [the petitioner's] favor." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir. 2000).

The decision to grant a COA is evaluated in light of "the deferential standard of review the district court applied to the habeas petition as required by AEDPA." *Williams v. Stephens*, 761 F.3d 561, 566 (5th Cir. 2014) (internal citation and brackets omitted). To obtain federal habeas relief from state custody, AEDPA requires the petitioner to demonstrate that the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), or, as relevant here, "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). *Williams*, 761 F.3d at 566.

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in

14

the first instance." *Wood v. Allen*, 558 U.S. 290, 301, 130 S. Ct. 841, 849 (2011). "Instead § 2254(d)(2) requires that we accord the state trial court substantial deference." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015). It is therefore "not enough to show that a state court's decision was incorrect or erroneous"; the state court decision must be "objectively unreasonable," which would be the case if "'a reasonable factfinder *must* conclude' that the state court's determination of the facts was unreasonable." *Blue v. Thaler*, 665 F.3d 647, 654–55 (5th Cir. 2011) (emphasis original) (citing *Rice v. Collins*, 546 U.S. 333, 341, 126 S. Ct. 969, 975 (2006)).

Findings of fact by a state court are, moreover, accorded a "presumption of correctness" when under review by a federal habeas court, which the petitioner has the burden of rebutting by "clear and convincing evidence." 28 U.S.C. § 2254 (e)(1); *Miller-El*, 537 U.S. at 340, 123 S. Ct. at 1041; *Blue*, 665 F.3d at 654. While section 2254(e)(1)'s clear and convincing standard governs a state court's resolution of "particular factual issues," section 2254(d)(2)'s unreasonable determination standard governs "the state court's decision as a whole." *Blue*, 665 F.2d at 654.

## DISCUSSION

Weathers argues that his death sentence was imposed in violation of the Eighth Amendment pursuant to the Supreme Court's decision in *Atkins v. Virginia*, which proscribed the death penalty for anyone who is intellectually disabled. 536 U.S. 304, 321, 122 S. Ct. 2242, 2252 (2004). In Texas, intellectual disability claims are evaluated in accordance with the definition of intellectual disability provided by the American Association on Mental Retardation ("AAMR"). *Williams*, 761 F.3d at 572. Under that standard, intellectual disability is characterized by: "(1) significantly subaverage general intellectual functioning; (2) accompanied by related limitations in adaptive functioning; (3) the onset of which occurs prior to the age of 18." *Id.* (citing *Ex Parte Briseno*,

135 S.W.3d 1, 7 (Tex. Crim. App. 2004)). *Briseno* additionally enumerated seven evidentiary factors to aid the factfinder in assessing intellectual disability claims under the AAMR standard. *Id.* Whether an individual is intellectually disabled is a question of fact. *Maldonado v. Thaler*, 625 F.3d 229, 236 (5th Cir. 2010).

Weathers advances two arguments in support of his contention that the state court unreasonably determined the facts in light of the evidence presented.[9] First, he argues that the state court was unreasonable in crediting Dr. Sparks's testimony that a prolonged period of isolation on death row could make an individual appear to be less intelligent than he is because Dr. Sparks was not qualified to render an opinion about intellectual disability. *Id.* Second, Weathers contends that the state court's determination that Dr. Murphey was not credible was made in the face of clear and convincing evidence to the contrary. *Id.* We disagree that reasonable jurists could debate the propriety of the district court's conclusions that (a) the state court did not unreasonably determine the facts in light of the evidence in the record, and (b) nor were the state court's factual findings incorrect by clear and convincing evidence.

**1. Dr. Sparks's Credibility**

Weathers's first point of error focuses narrowly on the state court's conclusion, pertinent to the first AAMR/*Briseno* criterion, that Weathers failed to establish that he suffers from significantly sub-average intellectual functioning. Weathers contends this conclusion was clearly erroneous by questioning the psychiatrist's qualifications to offer an expert opinion regarding whether or not an individual is intellectually disabled. Weathers

---

[9] Weathers's brief invokes *Florida v. Hall*, 134 S. Ct. 1986 (2014) repeatedly for the proposition that Dr. Sparks's testimony was inconsistent with that case because he did not employ "the medical community's diagnostic framework" in evaluating Weathers. Weathers does not contend, however, that the state court unreasonably applied *Florida v. Hall* under 28 U.S.C. § 2254(d)(1).

asserts that the state court erroneously relied on Dr. Sparks's statement that an individual kept in isolation could appear less intelligent than he actually is on an IQ test because: (1) Dr. Sparks could not recall the three (AAMR) prongs involved in diagnosing intellectual disability at one point during his testimony; (2) Dr. Sparks is not familiar with the 11th edition of the book *Intellectual Disabilities*, which was published after he retired in 2006; and (3) Dr. Sparks's evaluation of Weathers for competency to stand trial was not based on any peer-reviewed protocol and he did not employ a diagnostic team as required by Texas law.

Reasonable jurists, however, could not debate whether the state court's reliance on Dr. Sparks's testimony was "objectively unreasonable." To find otherwise, "a reasonable factfinder *must* conclude" that the state court's factual reliance was unreasonable. *Blue*, 665 F.3d at 654–55 (emphasis in original). Dr. Sparks was an experienced psychiatrist employed for sixteen years by Bexar County and University Health Systems where he routinely evaluated thousands of inmates of the Bexar County jail for competency to stand trial. While Dr. Sparks did not personally test inmates for intellectual disability, he initially evaluated them. When he suspected an inmate was suffering from an intellectual disability, he would forward the individual to licensed staff psychologists for appropriate standardized IQ testing.

Because Dr. Sparks spent sixteen years evaluating inmates' competency to stand trial, it was not objectively unreasonable for the state court to conclude that Dr. Sparks had sufficient familiarity with the characteristics of intellectual disabilities in prison inmates and to credit Dr. Sparks's statement about the effects of prolonged isolation on an inmate's mental capacity. As we have previously noted, in cases involving a "battle between experts" at the state trial court, "[i]t is not this court's place to second-guess the [state] court's

credibility determinations" even if "a different factfinder might reach a different conclusion." *Chester v. Thaler*, 666 F.3d 340, 349 (5th Cir. 2011).

Even if Weathers could demonstrate that reliance on Dr. Sparks's testimony for this point was clearly erroneous, *but cf. Matamoros v. Stephens*, 783 F.3d 212, 220 (5th Cir. 2015) ("Alternatively, our review is limited to the state court's *decision*, 'not the written opinion explaining that decision.'" (quoting *Maldanado*, 625 F.3d at 239)), that would not rebut, under a clear and convincing evidence standard, the state court's factual finding that Weathers failed to prove that he has significantly sub-average intelligence. 28 U.S.C. § 2254(e)(1). As the district court pointed out, other evidence—wholly apart from Dr. Sparks's testimony—supported this finding, including a serious question whether Weathers gave his best effort on Dr. Murphey's IQ tests when he knew that obtaining habeas relief would allow him to avoid the death penalty, Dr. Murphey's own disavowal of the IQ score of 53 as inaccurate, and Weathers's score of a 79 on the IQ test in 2008. Reasonable jurists could not debate the district court's conclusion that the state court's findings were not unreasonable or contradicted by clear and convincing evidence.

**2. Dr. Murphey's Credibility**

Weathers's second point of error contends that the state court's refusal to credit Dr. Murphey's conclusions was clearly and convincingly incorrect. Weathers's brief, however does not challenge any particular aspect of the state court credibility determination. Indeed, his argument concerning this point appears simply to recapitulate Dr. Murphey's trial testimony regarding her evaluation of Weathers for intellectual disability. His brief does not join issue with the district court's conclusion that the state court could have reasonably questioned Dr. Murphey's assessment that Weathers is intellectually disabled for a number of reasons. She did not review the record from the punishment phase of Weathers's trial, which contained a bevy of relevant information

contradicting the information she relied on.  The ratings used to determine whether Weathers possessed adaptive deficits were supplied by Weathers's family and friends who had an obvious interest in this case.  Moreover, the nearly twenty hours of phone conversations cast doubt on the notion that Weathers possesses adaptive deficits in the areas of communication and social skills, *cf. Maldonado*, 625 F.3d at 243 (noting that an inmate's prison letters failed to "facially give an impression of substantial intellectual impairments"). Even Dr. Murphey admitted the conversations' content was "above-average."[10] Weathers's mere recitation of the testimony of Dr. Murphey is therefore insufficient to create a dispute among reasonable jurists that the state court's doubt about Dr. Murphey's testimony was rebutted by clear and convincing evidence, or that the ultimate no intellectual disability finding was unreasonable in light of the evidence presented.

Finally, we note the dearth of evidence concerning the third prong of *Briseno* (adopting the AAMR), whether any intellectual disability and adaptive deficits were evident before age 18.  *See id.* at 241 (noting that "fulfillment of each prong is necessary to a finding of mental retardation").  There was no IQ evidence before Weathers turned 18, and the anecdotal evidence about his pre-adult years was decidedly mixed.  To repeat, while two of Weathers's middle and high school teachers testified that he struggled at reading and writing, several other teachers noted in school reports that he was capable of doing the

---

[10] Weathers's reply brief points out that Dr. Murphey concluded that Weathers possesses adaptive deficits in the area of functional academics in addition to communication and social skills.  The district court does not appear to have addressed this contention explicitly, but Weathers's middle school and high school teachers during the punishment phase of his trial testified that Weathers was capable of doing the work, but simply would not do it.  This testimony casts doubt on Dr. Murphey's contention that he had adaptive deficits in the area of academics and therefore supports the state court's determination that Weathers failed to carry his burden of demonstrating that he possesses adaptive deficits by clear and convincing evidence.

work but simply would not.  The trial court found reason to question the credibility of one of the teachers testifying in support of Weathers because she in fact awarded Weathers grades of 87 and 85.  Additionally, that Weathers was placed in special education classes when he was younger was not probative because students were placed in such classes for a variety of reasons, including emotional and behavioral disorders, and no reason was produced why Weathers was so classified.  In any event, Weathers's high school principal testified during trial that Weathers was screened for special education courses, but his teachers believed he could do the work.  The state court added that Weathers received a smattering of good grades throughout school, and his decline in performance corresponded with his disruptive and defiant behavior. Also, Weathers held a job for three years as a teenager and was promoted to a supervisor position.

For these and other reasons, abundantly detailed in the district court and state court opinions, the state court could have reasonably concluded that the sufficiency of Weathers's proof of a low IQ score was doubtful, and that he failed to prove the other *Briseno* (AAMR) criteria of adaptive functioning deficits and onset before age 18.  The district court's conclusion sustaining the state court decision under AEDPA criteria is not debatable among jurists of reason.

## CONCLUSION

Weathers has not presented evidence in his application for a COA that would cause reasonable jurists to debate whether the petition should have been resolved in a different manner.  *Miller-El*, 537 U.S. at 336, 123 S. Ct. at 1039. Weathers's application for a COA is **DENIED**.