# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-70020

United States Court of Appeals
Fifth Circuit

**FILED**
May 24, 2017

Lyle W. Cayce
Clerk

ROSENDO RODRIGUEZ, III,

Petitioner - Appellant

v.

LORIE DAVIS, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 5:13-CV-233

Before JONES, SMITH, and DENNIS, Circuit Judges.

EDITH H. JONES, Circuit Judge:*

A jury found Rosendo Rodriguez, III, guilty and sentenced him to death for murdering a pregnant woman after he sexually assaulted her. After exhausting his state remedies, Rodriguez filed a federal habeas petition under 28 U.S.C. § 2254, raising, *inter alia*, ineffective assistance of counsel claims. In a 96-page opinion, the district court denied the petition and dismissed it with prejudice. Rodriguez now seeks a certificate of appealability (COA) under 28 U.S.C. § 2253(c). For the following reasons, we **DENY** the COA application.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-70020

## BACKGROUND

The district court summarized the facts as follows:

### I.      Pretrial

On September 13, 2005, workers using heavy equipment to spread and compact garbage in a Lubbock city landfill found the body of Summer Baldwin in a suitcase.  Baldwin, a prostitute, had been a witness in a federal counterfeiting case, which triggered FBI involvement in the investigation of her death.  Financial records obtained via federal grand jury subpoena revealed that Rodriguez's debit card was used to purchase an identical suitcase at Walmart the day before.  The store's surveillance video showed that Rodriguez matched the description of the man last seen with Baldwin alive.  Hotel and bank records indicated that Rodriguez's debit card was also used to rent a hotel room in Lubbock under the name "Thomas" Rodriguez.  Based on the foregoing information, Rodriguez was arrested at his parents' home in San Antonio.

Rodriguez retained Albert Rodriguez ("Albert") as counsel. Albert is not related to Rodriguez but was an acquaintance of Rodriguez's father, a well-known criminal defense attorney from Wichita Falls.  Three weeks after his arrest, Rodriguez gave a recorded statement to the police, with Albert present, admitting that he had engaged in consensual sex with Baldwin but killed her in self-defense after she attacked him with a knife.  The ongoing police investigation also linked Rodriguez to the disappearance of 16-year-old Joanna Rogers, who had been missing for more than a year.

In the summer of 2006, Rodriguez negotiated a plea bargain with the assistance of new counsel, Jeff Blackburn.  Rodriguez agreed to plead guilty to Baldwin's murder and disclose his involvement in Rogers's murder.  If his information could be corroborated by the recovery of Rogers's body, the State would reduce the capital murder charge to murder, offer a sentence of life imprisonment, and grant Rodriguez immunity from prosecution for Rogers's murder.  Rodriguez confessed to Rogers's murder, and her body, like Baldwin's, was found in a suitcase in the Lubbock city landfill.

The plea agreement did not go forward as planned, however. On the scheduled day in October of 2006, Mr. Blackburn regretfully informed the trial court of a bizarre series of events, the

2

No. 16-70020

likes of which he had never encountered in his law practice. For the preceding twenty-four hours, Rodriguez had maintained that he did not understand anything he was being told. Rodriguez told the trial judge he did not understand his questions. As a result, the plea did not go forward, Mr. Blackburn withdrew from the case, and the State gave notice of its intent to seek the death penalty. Richard Wardroup and Fred Stangl were appointed as new counsel. The trial court granted a change of venue because of publicity surrounding the search for Rogers's body; in March of 2008, the parties proceeded to trial.

## II.    Trial

The prosecution alleged two different theories of capital murder: (1) intentionally or knowingly causing Baldwin's death while in the course of committing or attempting to commit aggravated sexual assault, and (2) intentionally or knowingly causing the death of more than one person in the same criminal transaction, specifically, Baldwin and her child in utero. *See* Tex. Penal Code Ann. § 19.03(a)(2), (7). [Footnote omitted.] The State presented evidence showing that Rodriguez had been in Lubbock for training with the United States Marine Corps Reserve when he picked up Baldwin in the early morning hours of September 12, 2005, and took her to his hotel room where he beat, strangled, and sexually assaulted her. He then purchased the suitcase, placed her body in it, and threw it in a dumpster. The defense argued that the sex was consensual, that Rodriguez had no knowledge of the pregnancy, and that his Marine combat instincts took over and he killed Baldwin accidentally in self-defense after she wielded a knife at him. The jury returned separate guilty verdicts on each theory.

At the punishment phase, the State introduced evidence of five other sexual assaults committed by Rodriguez and a misdemeanor theft charge for which he had served probation. The jurors received evidence connecting Rodriguez to the disappearance of Rogers, but they did not receive his confession to her murder. The defense introduced evidence and argument that Rodriguez could safely serve a life sentence in prison, that Rodriguez was a respectful, intelligent person, and that Rodriguez grew up in a home with an abusive, domineering, alcoholic father. The jury answered two special issues in a way that required a

3

death sentence under Texas law.  *See* Tex. Code Crim. Proc. Ann. art. 37.071, §§ 2(b)(1) and (e)(1).

### III.    Post-conviction proceedings

The trial judge appointed attorney J.R. Wall on direct appeal and Paul Mansur as state habeas counsel.  Mr. Wall filed a motion for new trial that the trial court denied after a live hearing, and then filed a brief raising forty-two claims on appeal.  The Texas Court of Criminal Appeals ("CCA") affirmed the conviction. *Rodriguez v. State*, No. AP-75901, 2011 WL 1196871, at \*1 (Tex. Crim. App. May 4, 2011) (not designated for publication), *cert. denied*, 132 S. Ct. 814 (2011).

Mr. Mansur filed a state habeas application raising twenty-one grounds for relief.  After a six-day hearing, the convicting court made written findings and conclusions recommending that relief be denied.  The CCA reviewed the record, adopted the lower court's findings and conclusions, and denied habeas relief.  *Ex parte Rodriguez*, No. WR-78127-01, 2013 WL 1920737, at \*1 (Tex. Crim. App. May 8, 2013).  Rodriguez then filed his amended federal petition raising twenty-six claims for relief.  All but one of these claims has been adjudicated on the merits in state court.

After a hearing, the district court denied Rodriguez's petition and dismissed it with prejudice.  The district court also denied Rodriguez's request for a COA. Rodriguez now renews his request for a COA in this court.

### STANDARD OF REVIEW

As a state prisoner whose habeas petition has been denied by a federal district court, "[f]ederal law requires that he first obtain a COA from a circuit justice or judge."  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing 28 U.S.C. § 2253(c)(1)).  "A COA may issue 'only if the applicant has made a substantial showing of the denial of a constitutional right.'"  *Id.* (quoting 28 U.S.C. § 2253(c)(2)).  Unless and until he secures a COA, this court "may not rule on the merits of his case."  *Id.* (citing *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003)).

No. 16-70020

The COA inquiry is "limited" and "not coextensive with a merits analysis." *Id.* at 773–74. "[T]he only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Id.* at 773 (quoting *Miller–El*, 537 U.S. at 327). Put otherwise, at this stage, the court must make only "an initial determination whether a claim is reasonably debatable" and nothing more. *Id.* at 774. That determination must be made without "full consideration of the factual or legal bases adduced in support of the claims." *Id.* at 773 (quoting *Miller–El*, 537 U.S. at 336). In conducting the inquiry, this court "must be mindful of the deferential standard of review the district court applied to [the habeas petition] as required by the AEDPA." *Williams v. Stephens*, 761 F.3d 561, 566 (5th Cir. 2014) (quoting *Miniel v. Cockrell*, 339 F.3d 331, 336 (5th Cir. 2003)) (alteration in original). That standard required Rodriguez to prove that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* (quoting 28 U.S.C. § 2254(d)). Finally, "any doubt as to whether a COA should issue in a death-penalty case must be resolved in favor of the petitioner." *Pippin v. Dretke*, 434 F.3d 782, 787 (5th Cir. 2005).

## DISCUSSION

Rodriguez advances four claims for relief. Each claim asserts that Rodriguez's counsel was ineffective, although one claim includes additional constitutional violation allegations and another involves procedural default. Because ineffective assistance of counsel claims comprise most of Rodriguez's

5

No. 16-70020

appeal, we set out the principles governing these claims before addressing each claim in turn.

## I. Ineffective Assistance of Counsel

To establish that he was denied constitutionally effective assistance of counsel, Rodriguez must show that (1) his counsel rendered deficient performance, and (2) his counsel's actions resulted in prejudice. *E.g.*, *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). Rodriguez must prove both prongs, and the failure to prove either one will defeat the claim. *Id.* "In determining whether counsel's performance was deficient, courts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Williams v. Stephens*, 761 F.3d 561, 567 (5th Cir. 2014) (quoting *Strickland*, 466 U.S. at 689)). Judicial scrutiny of counsel's conduct "must be highly deferential" and avoid "the distorting effect of hindsight." *Id.* (quoting *Strickland*, 466 U.S. at 689–90). As to prejudice, Rodriguez must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (quoting *Strickland*, 466 at 694). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011). And the deferential *Strickland* standard is more deferential still— indeed, "'doubly' so"—when it is applied, as in this case, in tandem with section 2254(d). *Id.* at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

## II. Rodriguez's Claims

### A. Failure to Investigate and Present Mitigating Evidence

Rodriguez's "core contention" is that "trial counsel were ineffective for failing to: 1) conduct a more thorough mitigation investigation; 2) present additional mitigation evidence relating to incidents of abuse, violence and dysfunction in the Rodriguez family; 3) investigate his father's medical and mental-health records; and 4) present non-family witnesses who would corroborate the Rodriguez family's testimony about his father's abuse, alcoholism, and mental health issues." The district court found that the state court did not unreasonably apply *Strickland* in rejecting these arguments.

In his request for a COA, Rodriguez proffers several purported "dimensions of debatability" regarding the district court's conclusion that the state court did not unreasonably apply *Strickland*. First, he says that the district court's conclusion is debatable because the court incorrectly applied the law. He emphasizes the district court's statement that his claim came down to "matters of degree: Did counsel talk to enough witnesses about abuse? Did counsel interview the family members enough times under ideal circumstances? Did counsel extract enough details of the defendant's upbringing?" In his view, the court's statement improperly "avers that the fact that Rodriguez's defense team adduced some mitigation evidence pretermits the inquiry as to whether or not the investigation was sufficient." *Cf. Sears v. Upton*, 561 U.S. 945, 955 (2010) ("We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant.").

Rodriguez's argument is puzzling in several respects. To begin with, he complains of how the district court characterized his claim, but the court's characterization hewed closely to this court's precedents. Courts "must be

particularly wary of 'argument[s] [that] essentially come[] down to a matter of degrees.   Did counsel investigate enough?   Did counsel present enough mitigating evidence?   Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson*, 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson*, 190 F.3d 698, 703 (5th Cir. 1999)) (alterations in original).   Rodriguez's demands for a "more thorough investigation," "additional mitigation evidence," and corroborating testimony are all arguments that come down to matters of degree—arguments that courts "must be particularly wary" of entertaining.   In addition, Rodriguez quotes only the district court's summation of its 12-page analysis of trial counsel's comprehensive mitigation case.   The district court carefully assessed each of Rodriguez's arguments and explained why the state court did not unreasonably conclude that Rodriguez failed to overcome the presumption of his counsel's competence.   Notably, Rodriguez does not explain how the district court's rejection of any particular argument is debatable; instead, he summarily states that there were "crucial failures by counsel in their investigation."   In light of the district court's faithfulness to Fifth Circuit precedent and detailed analysis of the mitigation case, reasonable jurists could not debate the district court's conclusion.

Second, Rodriguez argues that reasonable jurists could debate the district court's conclusion because the district court itself noted that there was conflicting evidence.   But Rodriguez mischaracterizes the district court's statements.   The court indeed stated that "the details of abuse and the family history conflicted in many ways" and that "the testimony among the habeas witnesses is rife with conflict[.]"   In context, however, the district court made those observations in its prejudice analysis to show how unpersuasive and potentially harmful the proposed additional evidence would be, not to show that the issue of prejudice was debatable.   In the court's words, the state court

reasonably found no prejudice because "[t]he new mitigating evidence would barely have altered the 'sentencing profile' presented to the jury and may have even been harmful." Rodriguez does not attack this specific conclusion in the prejudice analysis, nor could reasonable jurists debate it.

Finally, in a one-sentence argument, Rodriguez asserts that, "[a]cross the country, courts have found insufficient mitigation investigations into abusive family lives in circumstances less egregious that [sic] Rodriguez suffered." But, of the cases that Rodriguez cites in support of that statement, only one is from this circuit and all concerned obviously deficient mitigation work. *See Escamilla v. Stephens*, 749 F.3d 380, 392–93 (5th Cir. 2014) (among other deficiencies, counsel failed to hire a mitigation specialist, failed to apprise the defense expert of the petitioner's background and social history, and "never presented the jury with information regarding the disadvantages, instability, and trauma that [the petitioner] actually experienced as a child"); *Cauthern v. Colson*, 736 F.3d 465, 483–87 (6th Cir. 2013) (counsel failed to investigate and present evidence of family abuse); *Hooks v. Workman*, 689 F.3d 1148, 1203–04 (10th Cir. 2012) (among other deficiencies, counsel "made no attempt" to put on evidence of the petitioner's "life circumstances and his tragic, chaotic upbringing").

In contrast, Rodriguez's counsel's mitigation case contained none of those deficiencies. The district court thoroughly canvassed the mitigation effort, which included the following: counsel retained a mitigation specialist and worked with a neuropsychologist, a psychiatrist, and a forensic pathologist. The mitigation specialist interviewed Rodriguez's father, mother, and two sisters, and all four family members testified at trial. The mitigation specialist also interviewed Rodriguez's preschool teacher, four college acquaintances, a high school coach, detention officers, a jail librarian, and a Naval Academy contact. The mitigation specialist's report catalogued Rodriguez's family's

history of depression, and his father's bipolar disorder, tyrannical behavior, and alcohol and pain-medication abuse. As the district court noted, "[t]his is not a case where trial counsel overlooked abusive conduct, mental illness, and alcoholism in [Rodriguez's father]." Indeed, counsel presented evidence that his father was "an abusive alcoholic," and counsel "argued those facts in mitigation." This case, therefore, is quite different from the cases that Rodriguez cites, and, other than the sentence quoted above, he makes no argument to the contrary.

Reasonable jurists could not debate the district court's conclusion that the state court did not unreasonably apply *Strickland* in finding no deficiency or prejudice in counsel's mitigation effort.

## B. Unconstitutionally Obtained Confession

In his second issue, Rodriguez makes two claims regarding whether his confession was unconstitutionally obtained. First, he generally asserts that he did not confess freely, knowingly, intelligently, or voluntarily in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. Second, he asserts that his initial counsel, Albert, provided ineffective assistance by not thoroughly investigating the evidence in his case before allowing Rodriguez to confess. The arguments are interrelated, however, because his first argument rests on the idea that "if a defendant is denied counsel during a subsequent police interrogation, any confession is presumed involuntary." His theory is that Albert provided ineffective assistance of counsel, which effectively denied him counsel before and during his confession which, in turn, rendered his confession involuntary. For that reason, Rodriguez hinges both of his claims on whether "Albert's representation in this regard is deemed to be ineffective." The district court held that the state court reasonably found that counsel was not ineffective and that, as a corollary, Rodriguez confessed freely, knowingly, intelligently, and voluntarily.

Reasonable jurists could not debate the district court's conclusion that the state court reasonably found no deficiency or prejudice under *Strickland*. As to deficiency, *Strickland* makes clear that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." 466 U.S. at 691. Indeed, counsel's actions are "usually based" on "information supplied by the defendant," and "what investigation decisions are reasonable depends critically on such information." *Id.* Here, the record shows that Rodriguez was adamant about speaking to the police. In his initial meetings with Albert, Rodriguez demanded to speak to the police to establish that he acted in self-defense. He also asked Albert to give to the police knives that Rodriguez had taken from Baldwin to prove he acted in self-defense. Albert warned Rodriguez that the police also suspected his involvement in the Rogers disappearance, yet Rodriguez persisted and Albert acquiesced. Moreover, in the interview itself, Rodriguez confirmed no fewer than five times that he had wanted to speak with the police and that he was doing so "completely of [his] own volition." For his part, Albert knew that the police had a strong case against Rodriguez because he had interviewed several witnesses, met with the lead detective, visited the hotel where the crime occurred, and viewed the police reports and surveillance footage. He knew the importance of raising a self-defense theory sooner rather than later. And he knew that Rodriguez had some bruises and a scratch, which at least facially corroborated Rodriguez's self-defense story. Finally, the fact that police offered Rodriguez a plea deal—from which he later backed out—demonstrates the reasonableness of Albert's strategy. In light of these circumstances, reasonable jurists could not debate the district court's conclusion that the state court reasonably found that Albert's assistance and investigation were not deficient and that the confession was constitutionally obtained.

Even assuming deficiency, however, the same would be true of the prejudice analysis.  The district court recounted some of the strong evidence against Rodriguez even without his confession: proof that he rented the hotel room where Baldwin's blood was found; security camera footage showing him purchasing gloves and a suitcase and placing them in his rental truck; his internet searches about Baldwin's murder following the crime; and evidence matching his DNA to that found on Baldwin.  Further, if anything, the admission of his confession helped, rather than hurt, him.  As the district court noted, "the complained-of police statement allowed Rodriguez to argue the following facts to the jury without having to testify: (1) Baldwin used a knife; (2) he acted in self-defense; (3) he was unaware of Baldwin's pregnancy; (4) the sex was consensual; and (5) (in conjunction with the autopsy report) Baldwin used crack cocaine."  Reasonable jurists thus could not debate the district court's ruling that the state court reasonably found that Albert's assistance did not prejudice Rodriguez.

## C. Failure to Object to Evidence on Relevance Grounds

Rodriguez asserts that his trial counsel was ineffective for not objecting on relevance grounds to two photographs of Summer Baldwin's unborn child.  As with the other claims, the district court held that the state court reasonably applied *Strickland* in rejecting this claim.

As explained above, one of the State's capital-murder theories was that Rodriguez had committed a double-murder.  *See* Tex. Penal Code § 19.03(a)(7)(A) (defining capital murder in part as murder where "the person murders more than one person . . . during the same criminal transaction").[1]  At

---

[1] The Texas Penal Code defines "person" in part as "an individual" and, in turn, defines "individual" as "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth."  Tex. Penal Code § 1.07(a)(26), (38).  It also defines "[d]eath" as including, "for an individual who is an unborn child, the failure to be born alive."  *Id.* § 1.07(a)(49).

the time of Rodriguez's trial, CCA precedent held that the "transferred intent" doctrine applied to multiple-murder capital prosecutions where an unintended victim and the intended victim are both killed. *See Norris v. State*, 902 S.W.2d 428, 437–39 (Tex. Crim. App. 1995). Thus, although there was no evidence that Rodriguez knew Baldwin was pregnant (and he claimed he did not know), Rodriguez could be liable under the double-murder capital theory so long as he intended to kill Baldwin. The State offered two photographs of Baldwin's child in utero in support of the double-murder capital theory. Rodriguez's counsel vigorously objected under Texas Rule of Evidence 403 that the photographs were prejudicial and inflammatory; the district court voiced concerns about the photographs but overruled the objections.

After Rodriguez's trial, however, the CCA reversed course and held that the "transferred intent" doctrine may be used in the multiple-murder context "only if there is proof of intent to kill the same number of persons who actually died[.]" *See Roberts v. State*, 273 S.W.3d 322, 331 (Tex. Crim. App. 2008). Absent evidence that Rodriguez was aware that Baldwin was pregnant, there could be no evidence that he had formed the requisite intent to kill two persons. As a result, he could not be convicted under the double-murder capital theory after *Roberts*. The State conceded as much when it abandoned its defense of that theory on Rodriguez's direct appeal. *See Rodriguez*, 2011 WL 1196871, at *5.

Highlighting *Roberts*, Rodriguez now argues that his trial counsel was ineffective for not objecting to the photographs on *relevance* grounds. According to Rodriguez, "[i]t is totally counterintuitive for counsel to object at trial to both the unconstitutionality of the fetus murder count and the highly prejudicial nature of the autopsy photographs under Rule 403, but to then fail to raise an objection as to what relevance the photographs had to either the guilt/innocence or punishment trial." Contrary to Rodriguez's suggestion,

however, it would have been counterintuitive for Rodriguez's counsel to object to the relevancy of the photographs. Under pre-*Roberts* law, those photographs were not only relevant but were also essential to the State's double-murder capital theory. Rodriguez essentially proposes that his counsel's assistance be deemed deficient and prejudicial for counsel's "failure" to lodge a then-frivolous objection and anticipate a change in the law. Reasonable jurists could not debate the district court's conclusion that the state court did not unreasonably apply *Strickland* in rejecting Rodriguez's proposals. *See, e.g.*, *United States v. Fields*, 565 F.3d 290, 294 (5th Cir. 2009) (stating that defense counsel has no general duty to anticipate changes in the law); *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").

## D. Failure to Challenge Whether a Trash Compactor, Not Rodriguez, Caused Baldwin's Blunt-Force Injuries

Rodriguez asserts that his trial counsel was ineffective for failing to challenge whether Rodriguez was the source of Baldwin's blunt-force injuries.

As an initial matter, Rodriguez concedes that, because his state habeas counsel did not raise this claim, the claim is procedurally defaulted unless he can establish cause to excuse the default under *Martinez v. Ryan*, 566 U.S. 1 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). A prisoner may establish cause for a default of an ineffective assistance claim where (1) the state courts did not appoint counsel in the initial-review collateral proceeding for a claim of ineffective assistance at trial, or (2) appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under *Strickland*. *Martinez*, 566 U.S. at 14. Further, "[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* In *Trevino*,

the Supreme Court held that "the *Martinez* exception applies in [the Texas] procedural regime." 133 S. Ct. at 1915.

The district court held that because Rodriguez did not satisfy the *Martinez* exception, the claim is procedurally defaulted. Because the district court rejected this claim on procedural grounds, this court must consider whether "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Rodriguez claims that his state habeas counsel and trial counsel were both ineffective for failing to challenge "whether Rodriguez simply chocked [sic] Baldwin during a struggle, in which he claimed he acted in self-defense, or instead brutally and repeatedly beat her prior to dumping her body." Rodriguez says trial counsel's "failure" to argue that a trash compactor caused Baldwin's injuries "all but gutted his self defense case[.]" In his view, "[c]ounsel's failure to shed light on the possibility that Rodriguez chocked [sic] Baldwin in self-defense, and thereby letting the jury presume that her multiple trauma injuries were inflicted over the course of a long and horrific beating, most certainly prejudiced the outcome of this case." He also contends that "[s]tate habeas counsel's failure to spot and develop this instance of ineffective assistance of trial counsel defaulted this claim and prejudiced the outcome of this case contrary to the *Martinez* holding."

Reasonable jurists could not debate the district court's holding that Rodriguez did not establish cause to excuse the default and demonstrate that his underlying claim has "some merit." *Martinez*, 566 U.S. at 14. Beginning with Rodriguez's trial counsel, Rodriguez's argument that counsel effectively gutted his self-defense claim appears to have a serious flaw: he had no self-defense claim as to the capital murder charge involving aggravated sexual

assault on which the jury convicted him. The jury charge, which Rodriguez never challenged, plainly states, "You are not to consider the law of self-defense as to capital murder. The law of self-defense applies only to the offense of murder as to this charge." This explains why, when arguing in closing against the capital theory involving aggravated sexual assault, Rodriguez's trial counsel pressed his only real defense to this charge, that Rodriguez and Baldwin engaged in consensual sex, which would not constitute aggravated sexual assault. *See* Tex. Penal Code § 22.021(a)(1)(A)(i)–(iii) (requiring the absence of consent). Rodriguez does not explain how his counsel could be ineffective for allegedly gutting a defense that did not exist as to the capital charge on which he was convicted, especially when counsel advanced the defense that did exist.

Beyond that problem, there were obvious reasons why attempting to blame a trash compactor for Baldwin's blunt-force injuries was inadvisable. To begin with, that argument would not explain all of Baldwin's horrific injuries. Rodriguez's counsel retained a pathologist who reported that the "very good" forensic work on Baldwin's injuries showed it could not "reasonably be argued that there wasn't sexual assault" or that Rodriguez acted in self-defense. Thus, that a trash compactor caused the blunt-force injuries would not explain the internal sexual assault injuries that the pathologist confirmed.

Second, if Rodriguez's counsel argued that a trash compactor caused the blunt-force injuries, he would effectively concede that Baldwin had been buried and compacted alive. This follows from expert testimony at trial that humans must have "continued cardiac output" to produce bruises like the bruises found on Baldwin's body. If the trash compactor caused the bruises, then it would have done so while she was alive. That concession would contradict Rodriguez's statement in his confession that Baldwin had no pulse before he placed her in the suitcase. It would also contradict his general position that

16

he killed her in self-defense.  Finally it would exacerbate the already-gruesome nature of Baldwin's death.

As the district court stated, even if Rodriguez acted in self-defense at some point, there is "no question that Rodriguez left her in the trash dumpster, the foreseeable and perhaps intended result of which was that she would be compacted like trash."  There was no prejudice from counsel's approach.  In sum, reasonable jurists could not debate the district court's conclusion that Rodriguez failed to show "some merit" to his underlying claim that his trial counsel's assistance was deficient and prejudicial under *Strickland* for not pursuing the trash-compactor argument.

In the same vein and for the same reasons, reasonable jurists could not debate the district court's holding that Rodriguez did not establish cause in the form of state habeas counsel's ineffectiveness for the purported failure to uncover and pursue the trash-compactor argument.  Perhaps more notable here, however, is the incredible effort that state habeas counsel put into Rodriguez's state habeas petition: arguments and exhibits supporting 21 grounds for relief contained in 235 pages and tested and supplemented during a 6-day evidentiary hearing.  Given the problems with advancing a trash-compactor argument and the massive state habeas effort, reasonable jurists could not debate the district court's conclusion that Rodriguez did not show cause—*i.e.*, that state habeas counsel was ineffective—to overcome the procedural default on this ineffective assistance claim.

For all of these reasons, reasonable jurists could not debate the district court's ruling that this ineffective assistance claim is procedurally barred.

## CONCLUSION

For the foregoing reasons, Rodriguez's COA request is **DENIED**.